UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

DESIREE OGLESBY SCHMIDT,       )
                               )
            Plaintiff          )
                               )
        v.                     )   Case No. 2:07 cv 65
                               )
MICHAEL J. ASTRUE,             )
Commissioner of Social Security )
                               )
            Defendant          )

OPINION AND ORDER

This matter is before the court on the petition for judicial review of the Commissioner of Social Security filed by the plaintiff, Desiree Oglesby Schmidt, on July 20, 2007.  For the reasons set forth below, the decision of the Commissioner is **AFFIRMED.**

Background

The plaintiff, Desiree Oglesby Schmidt, applied for Supplemental Security Income on March 18, 2003, alleging a disability onset date of February 22, 2000.  However, eligibility for benefits exists only following the filing of the SSI application.  (Tr. 63-64)  The claim was denied initially on August 26, 2003, and again upon reconsideration on February 10, 2004.  (Tr. 33)  Schmidt requested a hearing before an Administrative Law Judge ("ALJ") on March 24, 2004.  (Tr. 36)  A hearing before ALJ Denise McDuffie Martin was held on August 31, 2005, and medical expert Dr. Robert W. Marquis, a board certified psychiatrist, as well as vocational expert Pamela Tucker, testified at the hearing.  (Tr.

485)  On October 4, 2005, the ALJ denied Schmidt's application by written decision.  (Tr. 16-22)  Following a denial of her request for review by the Appeals Council on January 12, 2007, Schmidt filed a complaint in this court on July 20, 2007.

The record contains significant inconsistent details. Schmidt was born on September 24, 1963.  (Tr. 63)  At the time of her hearing before the ALJ, she was 41 years old.  (Tr. 16) She has an 11th grade education, and although she stated at the hearing that she required special education (Tr. 488), other documents deny this.  (*See, e.g.,* Tr. 72, 271)  Schmidt is the mother of two children, a daughter and a son, who have been in the custody of others, including their father and foster care, throughout the time included in the record.  (Tr. 220, 270, 472) The record indicates several times that Schmidt was married to the father of her children, (Tr. 216, 270, 275), but it also indicates that she never has been married.  (Tr. 63)  The record indicates instances where Schmidt reported no history of mental illness (Tr. 217, 223), and instances where Schmidt reported a history of mental illness.  (*See, e.g.,* Tr. 216, 253, 270, 284) Likewise, the record contains documents in which Schmidt denied a history of substance abuse (Tr. 217, 224), and documents in which she admitted substance abuse. (*See e.g.,* Tr. 220, 262, 274, 291, 294-95, 471)

Schmidt's medical records begin in January 2000, when she was admitted to the emergency room following a motor vehicle accident.  (Tr. 97-101)  Just over a month later, on February 22,

2

2000, Schmidt again was admitted to the hospital suffering from a gunshot wound to her right hip. (Tr. 102-21) This date of admission coincides with the date that Schmidt identified as her disability onset date. (Tr. 63-64) The bullet's internal path damaged her uterus, intestines, and rectum. (Tr. 102) The damage required surgery to repair the intestinal damage and a colostomy to allow Schmidt's intestines and rectum to heal. (Tr. 123-26) Following her twenty-day hospital stay, Schmidt was released from the hospital on March 12, 2000. (Tr. 102)

Schmidt visited the emergency room with various complaints relating to her gunshot injury and colostomy over the following three months. (Tr. 152, 157, 165, 170, 174, 183) She complained of abdominal pain, foot, leg, and hip pain, and lack of "money for meds." (Tr. 152, 183, 157, 165, 170, 174, 165) On the last of these visits, June 11, 2000, Schmidt was readmitted to the hospital for further tests. (Tr. 183-87) Dr. G. Uwidia noted Schmidt's past noncompliance with the care required for her healing and stated that she "is not able to deal psychologically" with the colostomy. (Tr. 185, 198) She was released following a series of tests attempting to diagnose possible bowel obstruction or gastroenteritis. None were discovered, and Schmidt "spontane-ously regained her bowel tone." (Tr. 206-07) She was released on June 16, 2000, with no additional instructions or treatment other than that which she had been given prior to this hospital-ization. (Tr. 206)

On October 5, 2000, Schmidt began medical tests in prepara-

tion for a possible reversal of her colostomy.  (Tr. 211-14)  The
surgical reversal was not performed at this time, but no explana-
tory documents are evident in the record.

On October 31, 2000, Schmidt was admitted to Edgewater
treatment center complaining of manic depressive or bipolar
disorder.  (Tr. 216-19)  During her initial psychiatric evalua-
tion, Schmidt complained of depression since the age of seven and
denied any substance abuse.  (Tr. 223-25)  She continued to
receive treatment at Edgewater through April 5, 2001.  (Tr. 220-
21)  During much of this period, she received medications from
the Gary Community Mental Health Center including Serzone (an
antidepressant), Zyprexa (a mood stabilization medication used
for treatment of schizophrenia and bipolar disorders), Elavil (an
antidepressant), and Darvocet (a pain reliever).  (Tr. 226, 228)
Within this treatment period, Schmidt underwent a Functional
Capacity Assessment.  Her exertional limitations included lifting
a maximum of 20 pounds occasionally and ten pounds frequently,
standing and/or walking for at least two hours and sitting about
six hours in an eight-hour workday, and pushing or pulling
limitations in her lower extremities.  (Tr. 234)  The examiner,
Dr. J. Sands, M.D., noted that Schmidt's gunshot wound left her
with sciatic nerve damage which caused a moderately antalgic gait
and lowered range of motion in her hip and spine.  (Tr. 234)
This damage led Dr. Sands to recommend that Schmidt's limitations
include a prohibition of climbing.  (Tr. 235, 237)

Also within this time period, on February 8, 2001, Dr. J.

4

Pressner completed a psychiatric review technique indicating Schmidt's "impairment not severe" and "substance addiction disorders." (Tr. 241) In conclusion, Dr. Pressner noted:

> The claimant alleged disability due to physical problems and a bipolar disorder. The DDO obtained records from Richmond State Hospital and the Edgewood Center[1]. . . . The records contain the diagnosis of bipolar disorder, but it appears that this is the claimant's own diagnosis and that it has been included because she reports it. The medical records themselves do not indicate periods of extreme depression or hypomania when engaged in treatment. Indeed all the records seem to imply that the primary problems are related to alcohol and drug use. The claimant's allegations seem partially credible given the medical evidence in file and the positive correlation between the reports of functioning and the ME. It would appear that the claimant is somewhat limited. However, the current reports from Richmond do not indicate significant deficits although the claimant has multiple responsibilities for herself in this program. It appears that prior problems were in good measure due to the claimant's drug and alcohol use. If, in fact the claimant maintained sobriety medical improvement would be likely.
>
> (Tr. 253)

He concluded that Schmidt's condition was "non-severe." (Tr. 253)

On November 20, 2001, a Mental Status Examination of Schmidt by Dr. Patrick J. McKian related a GAF of 40, but it did not state any other diagnostic conclusions. (Tr. 270-72)

The record indicates that for a period of time in 2001 ending on September 24, Schmidt was incarcerated in the Lake

---

[1] The record includes repeated reference to The Edgewater Center. The court presumes that Dr. Pressner is referencing that facility.

County Correctional Facility.  (Tr. 271)  The record indicates a previous arrest for resisting arrest and battery, but it is unclear whether this refers to or resulted in this incarceration. (Tr. 329)  Admission records and treatment agreements from Richmond State Hospital also refer to periods of 2001 and perhaps early 2002.  (Tr. 255-68, 273-83, 284-310)  Within these records Schmidt agreed to treatment at Richmond State Hospital for drug, alcohol, and depression disorders.  (Tr. 273-77)  The admittance records dated December 5, 2001, state, "She came from jail." (Tr. 274)

In a statement made upon admission to Richmond State Hospital, Schmidt stated that she had been in jail five or six times, and the sentences were "predominantly from alcohol."  (Tr. 275) This form indicated that Schmidt's favorite alcohol was brandy and crack cocaine was her drug of choice.  (Tr. 274, 291) A record dated December 12, 2001, described Schmidt's psychotic symptomatology:

> Desiree denies auditory and/or visual hallu-
> cinations without use but during use heard
> voices that caused her to look in that direc-
> tion.  The voice tells her to get more drugs.
> The voice never tells her to hurt herself or
> others.  She has seen shadows, etc., but they
> do not frighten her.  This happens only dur-
> ing "use" and with extreme fatigue.  Desiree
> describes fluctuating moods and believes she
> is bipolar.  She presently is treated with
> antipsychotic and antidepressant medications.
>
> (Tr. 290)

This document also portrayed her substance abuse status:

> Desiree states her favorite alcohol is Brandy
> but began drinking wine in her "20s". Her
> drug of choice is "crack cocaine". Alcohol
> abuse has been related to 5 - 6 battery
> charges, which caused arrests. She comes
> from jail voluntarily with this admission
> seeking treatment for drug and alcohol abuse.
> She describes depression at times due to
> losses in her life, arrests, drug use, and
> children removed from her home. There is no
> family history of drug or alcohol abuse, she
> states.

(Tr. 291)

Again on May 30, 2002, a disjointed record of Schmidt's discharge from Edgewater Systems described her current situation as "Cl[ien]t has been incarcerated." (Tr. 311-12)

On March 10, 2003, Schmidt submitted to an admission assessment at Edgewater Systems and stated that she wanted medication and regularly abused alcohol and crack cocaine. (Tr. 313-15) At this time, she reported experiencing hallucinations, specifically of "spiders on the wall." (Tr. 313)

On March 27, 2003, Schmidt was admitted to the emergency room suffering from abdominal pain caused by an infected colostomy site. (Tr. 316-26) She stated that she had no colostomy supplies left and was concerned that her colostomy site was infected. (Tr. 318) During this visit, a drug screen of Schmidt revealed cocaine metabolites. (Tr. 324)

From April 2003 to December 2003, Schmidt was treated and attended classes at Edgewater. (Tr. 327-79) She complained of bipolar disorder, anxiety, depression, hallucinations, and persecutory delusions. (Tr. 327) Her psychiatric evaluation at

the time of her admission on April 8, 2003, reported her GAF as 60-70. (Tr. 327-29)

On May 9, 2003, Dr. Teofilo Bautista examined Schmidt on behalf of the Indiana Disability Determination Bureau. (Tr. 395-98) Dr. Bautista's impressions of Schmidt included chronic low back pain since 2000, bipolar disorder, depression and anxiety disorder, visual impairment of the left eye, post-gunshot wound with resultant colostomy, history of right ankle fracture in 1994, and history of short term memory loss. (Tr. 397) A psychiatric status report dated May 12, 2003, and conducted by Ronald Jenkins, MAS, a therapist at Edgewater, declared her GAF to be 42. (Tr. 388-94) Because this evaluation was completed by a staff member who was not a physician or a certified psychologist, it was countersigned by Dr. M. Castelino, a staff psychiatrist. (Tr. 393) On October 30, 2003, Dr. Castelino performed another psychiatric evaluation at Edgewater and assessed her GAF as 60. (Tr. 369-71) During this treatment time on November 12, 2003, Schmidt tested positive for morphine during a urine drug screen. (Tr. 380-81)

On June 17, 2003, Schmidt was admitted to the emergency room in a suicidal and intoxicated state. (Tr. 409-18) Her blood alcohol level was over 181 mg/dL, designated as high on the lab report. (Tr. 418) Her lab tests reported the presence of cocaine in her system. (Tr. 417) Schmidt reported feeling depressed and suicidal due to the death of her mother, which appears to have occurred at least three years before this event.

(Tr. 410; *cf.,* Tr. 217, 224, 274, 314, 385)  A psychiatric eval-
uation performed by Dr. J. Pressner dated August 19, 2003, stated
that "no weight is given" to the diagnosis of schizoaffective
disorder.  (Tr. 424-37)  Here, a third party report (referring to
the interview with Gail Brown, a friend, on Form SSA-5002 (Tr.
85-86)) suggested "adequate functioning except when [Schmidt] is
drinking."  (Tr. 436)  This evaluation concluded that "it is
reasonable to conclude that the claimant's condition is not
severely limiting at this time."  (Tr. 436)

Again, on August 23, 2003, Schmidt was admitted to the
emergency room with an irritated colostomy.  (Tr. 420-23)  She
was scheduled to undergo a surgical reversal of the colostomy
three days later.  (*See* Tr. 419)  Within the records from this
hospital stay, a report from Dr. Uwidia stated that Schmidt was
noncompliant and failed to present at previously scheduled times
for surgical colostomy reversal.  (Tr. 443) On August 26, 2003,
the surgery to reverse the colostomy was performed successfully.
(Tr. 440-42)

On October 13, 2003, Schmidt was admitted to the emergency
room complaining of pain in her side and constipation.  (Tr. 462-
66)  No bowel obstruction was detected, and Schmidt was treated
and released with instructions to increase her fiber and fluid
intake.  (Tr. 464-66)

In April 2004, Schmidt submitted to another Edgewater treat-
ment plan to help her control her thoughts and concentration.
(Tr. 468-69)  On June 28, 2005, Dr. Castelino conducted Schmidt's

annual psychiatric evaluation.  (Tr. 471-73)  Dr. Castelino concluded that she "was alert and oriented," her "overall cognitive functioning appeared normal," and she "seem[ed] to have fairly good social judgment, impulse control and insight into her problems."  (Tr. 472)  The evaluation assessed Schmidt's GAF to be 55-60.  (Tr. 472)  Dr. Castelino recommended Schmidt continue her medications, which were listed as Seroquel, Risperdal, and BuSpar, and concluded that Schmidt "appeared to understand the need for the medication and consented to continue her medications."  (Tr. 473)

Schmidt's hearing took place on August 31, 2005.  (Tr. 485) The hearing lasted 44 minutes.  (Tr. 485-511) Schmidt's attorney explained briefly Schmidt's educational background, mental and physical problems, and the "complicating factor" of her "alcohol and drug abuse that are repletedly [sic] on the record."  (Tr. 486) The attorney also pointed out that the "crux of the matter" was whether the mental impairment alone qualified Schmidt as disabled, pointing out that "a lot of times she goes to the hospital and there's inner play [sic] of both the substance abuse and the mental disorder."  (Tr. 486)

During the questioning, Schmidt's attorney asked her to state her full name.  (Tr. 486)  Before she responded, the attorney asked, "Are you with me?  Desiree, state your full name, please."  (Tr. 486)  During counsel's questions concerning her address, educational background, medical history, substance abuse history, and general living arrangements, Schmidt's answers often

were inaudible, and the ALJ repeatedly asked her to repeat her
answers.  (Tr. 486-500)  Schmidt testified about her hospital
visits, stating that she "tried to commit suicide" and "hear[s]
voices" that "told me to kill myself and stuff."  (Tr. 488)  She
denied alcohol abuse, stating that she drank before she was on
medication.  (Tr. 488)  Schmidt next testified that she had been
"seeing stuff on walls" for the past "couple years."  (Tr. 488)
However, she denied taking any illicit drugs, such as cocaine,
for the past eight months.  (Tr. 489-90)

Turning to Schmidt's psychiatric history, she testified that
she needed to take her prescribed medications every day because
she was sick and heard voices.  (Tr. 491)  She explained that the
voices told her that "somebody's gonna get me" and that she
"always think[s] someone is after me."  (Tr. 491)  Schmidt ex-
plained her living arrangements with her current boyfriend and
her daily routine, which involved waking at approximately 10:00
A.M., cooking breakfast, watching television, sleeping due to
medication side-effects, and large amounts of crying.  (Tr. 493)
Schmidt stated that a friend took her to Edgewater twice each
week to see her psychiatrist, Dr. Castelino.  (Tr. 494)  She
attempted to describe her anxiety attacks, but her answers were
partially inaudible and partially incomprehensible sentence
fragments:

> I just have [INAUDIBLE] 'cause I stayed in
> the hospital long and I can't, I have to go
> outside and I can't 'cause I'm scared to go
> outside.

11

                                    * * *

> Just I [INAUDIBLE] in my brain that I can't
> take it and I have to, and I have to take my
> medicine. . . .

> (Tr. 496)

Schmidt maintained that she did not leave the house except to
attend Edgewater sessions and to buy groceries.  (Tr. 496)  She
declared that she had been under psychiatric care sporadically
since the age of eight.  (Tr. 498) The attorney concluded his
examination of Schmidt by asking about her stay at Richmond State
Hospital, which she confirmed, stating that she "was abusing the
[INAUDIBLE]."  (Tr. 499)

Schmidt briefly described the physical problems that she
suffered following her gunshot wound.  (Tr. 495)  She related
pain in her right leg when she walked or remained standing too
long.  (Tr. 495)

The ALJ questioned Schmidt about her alcohol abuse, to which
she first responded she could not recall when she stopped drink-
ing, but guessed that it had been "about a year" since she stop-
ped drinking.  (Tr. 499-500)

The ALJ next questioned the medical expert, Dr. Robert W.
Marquis, M.D., a board certified psychiatrist.  (Tr. 500)  Dr.
Marquis testified that Schmidt's diagnosis was "very difficult,"
highlighting the record's diagnoses of schizo-affective disorder,
bipolar disorder, depression, schizophrenia, with symptoms of
both suicidal and psychotic episodes, with a history of substance

                                    12

abuse.  (Tr. 501)  Further discussing Schmidt's substance abuse,

Dr. Marquis stated:

> And there's a strong notation in the file as
> well, that she has a substance abuse history.
> Now I'm not able to find anything sense [sic]
> 6/03 indicating a urine drug screen, so other
> than her testimony today, I have no way of
> validating whether or not she's currently
> using.  If she were using cocaine or crack,
> that could very well cause the psychotic
> symptoms that she's having, but I can't, I
> can't tell.  I mean, it may be material and
> it may not.  I believe that she's psychotic
> at times, but whether or not drug abuse is
> material, I can't tell.

> (Tr. 501)

When Dr. Marquis began testifying about Schmidt's daily activity

impairment, he raised a question about her employment history,

which the ALJ asked her attorney to verify.  (Tr. 501-02) Her

attorney began by asking Schmidt, "Are you okay?"  (Tr. 502)

Schmidt's answers were partially inaudible, and it required

several questions from both counsel and the ALJ to elicit that

Schmidt never had worked.  (Tr. 502)

Returning to Dr. Marquis' examination, the ALJ asked the

medical expert to confirm that his opinion of Schmidt's capabili-

ties included "marked activities of daily living, marked social

functioning, marked concentration, persistence and pace."  (Tr.

503)  Dr. Marquis affirmed this, but he stated that he could not

confirm without a current drug screen whether Schmidt's impair-

ment was due to substance abuse.  (Tr. 503) Dr. Marquis proposed

that if she was not currently taking drugs, she would meet the

listing based on marked impairment and activities of daily

13

living, based on his observations of her behavior at the hearing
that day.  (Tr. 503)  Referring to an Edgewater report from June
2005, the ALJ questioned Dr. Marquis' opinion that Schmidt's
functioning was impaired:

> And what do you base that on then, 'cause I'm
> looking at the last report here from Edge-
> water of 6 of '05, and says she's sober but
> she drinks socially.  Hygiene is good, coop-
> erative, willing to provide information,
> [INAUDIBLE] and gold [sic] directed, no evi-
> dence of any delusions.  She claims to hear
> voices but could not elaborate on the voices,
> denied any panic attacks, was alert, oriented
> to time, place and person, overall cognitive
> functioning appeared normal.  She seems to
> have fairly good social judgement [sic],
> impulse control and insight to her problems
> with a GAF of 55-60.

> (Tr. 504)

At this time, Dr. Marquis clarified that the opinion that he had
previously given was based on Schmidt's behavior at the hearing,
stating, "I was going by more of what she was saying here in
. . . oral testimony."  (Tr. 504)  When the ALJ explained that
she was asking for his opinion "based upon the objective medical
evidence that we have in the file," Dr. Marquis agreed that the
report from her treating physician at Edgewater described "a mild
to moderate impairment in activities of daily living, and mild
impairment social functioning, and they're saying there's really
no impairment in persistence and pace."  (Tr. 504-05)  Dr. Mar-
quis determined Schmidt to require "probably minimal restric-
tions," noting her need for minimal contact with other people.
(Tr. 505)

Schmidt's attorney questioned the medical expert about the 2001 evaluation by a clinical psychologist which showed her GAF to be 40.  (Tr. 506)[2]  Dr. Marquis simply replied, "That was in 2001, though, counsel."  (Tr. 506)  Next, the attorney questioned Dr. Marquis about an evaluation giving Schmidt a GAF of 40-45. (Tr. 506)[3]  Dr. Marquis agreed with Schmidt's counsel that the file contained GAFs much lower than the most recent one given in June 2005, by Dr. Castelino.  (Tr. 506)  However, Dr. Marquis reiterated that Schmidt's condition "may change from time to time and it may be dependent partly on substance abuse . . ." (Tr. 506)  He also stated that he did not have any evidence that Schmidt suffered from a chronic organic mental syndrome due to abuse of alcohol and drugs over a period of years.  (Tr. 507)

The ALJ clarified the medical expert's testimony by asking if the lower GAFs indicated the use of drugs and/or alcohol at the time of the medical evaluation, to which Dr. Marquis agreed. (Tr. 507)  Furthermore, the ALJ asked the reverse:  if the higher GAF of 60, reported at a time when Schmidt denied any drug or alcohol use and was taking her prescription medications, indi-cated an accurate assessment of her capabilities when sober, to which Dr. Marquis also agreed.  (Tr. 508)

The ALJ presented a hypothetical to Pamela Tucker, the

---

[2]Though the transcript of the hearing deleted the name of the psychologist as inaudible, the evaluation referred to is the Mental Status Exam conducted by Dr. Patrick McKian. (Tr. 270-272)

[3]Here the report in question is the admission evaluation conducted at Richmond State Hospital by John C. Sartori, D.O., staff psychiatrist. (Tr. 274-277)

vocational expert, based on an individual of Schmidt's age, education, and work experience limited to light work, and minimal contact with others. (Tr. 509)  The ALJ further limited the hypothetical to simple, unskilled work, without exposure to heights, ladders, ropes, and scaffolds. (Tr. 509)  The VE responded that the hypothetical worker would be capable of doing housekeeping, packing, and bench sorting work. (Tr. 509)  The VE stated that the region contained approximately 12,000 housekeeping positions, approximately 10,000 packer positions, and approximately 600 bench sorter positions.

Responding to questions from Schmidt's counsel, the VE testified that the housekeeping positions would be eliminated for a worker with chronic back disorders, but the packer and bench sorter positions would not be eliminated. (Tr. 510)  The VE also declined to eliminate the positions of packer and bench sorter for a worker with attention-span deficits or lack of focus. (Tr. 511)

In her decision denying benefits, the ALJ found Schmidt suffered from at least one severe, medically-determinable impairment based on the conclusions of the physician consultants who reviewed the record, and she further found evidence of a history of substance abuse, depression, a schizoaffective disorder, and back pain. (Tr. 17)  However, the ALJ agreed with the consultants that Schmidt's impairments did not meet the criteria of any impairments listed in the regulations. (Tr. 17)  The ALJ noted that the medical expert at the hearing could not say for certain

16

whether drug addiction and/or alcoholism was material, but gave
the opinion that Schmidt would have only marked limitations with
the presence of substance abuse and only mild to moderate limita-
tions in the absence of substance abuse.  (Tr. 18)  The ALJ
stated that a finding of disability would be reached at the
fourth step based on active substance abuse.  (Tr. 18)

In accordance with the Regulations, the ALJ evaluated
whether Schmidt would be disabled if she stopped using drugs and
alcohol.  (Tr. 18)  The ALJ explained that the Regulations
required Schmidt to establish that she would experience permanent
impairments that would satisfy the durational requirement of a
continuous period of twelve months even after she stopped using
drugs and alcohol, with the severity of those impairments meeting
the disability requirements.  (Tr. 18)

Noting that Schmidt testified that she stopped drinking
about a year previously and last used drugs eight months previ-
ously, the ALJ described Schmidt's appearance and actions during
the hearing as "unsure and incoherent" and was unconvinced that
Schmidt was in remission from her addictions.  (Tr. 18)  The ALJ
discussed Schmidt's reluctance to testify as to the true nature
of her drinking and drug abuse in the face of the record of a
longstanding substance abuse.  (Tr. 18)  The ALJ contrasted
Schmidt's self-reports of psychiatric problems with medical
evaluator's findings that she displayed "normal overall cognitive
functioning" and her "thought process appeared logical and goal

17

directed."  (Tr. 18 (citing Ex. 44F))

The ALJ agreed with the testimony of the medical expert that without substance abuse, Schmidt would have only mild to moderate limitations in her activities and functioning.  (Tr. 18)  Thus, the ALJ declared that Schmidt could not be found disabled.  (Tr. 18-19)

Next, the ALJ determined whether Schmidt could meet the physical and mental demands of available employment opportunities.  (Tr. 19)  The ALJ first explored Schmidt's possible physical impairments, taking into account the residual effects of the gunshot wound, and assessed only minor physical restrictions, including the need to avoid working at heights and a total restriction against climbing ladders, ropes, and scaffolds.  (Tr. 19)  The ALJ then explored Schmidt's possible mental impairments, taking into account the record replete with inconsistent reports of her mental health history, limited mental impairment due to substance abuse, and noncompliance with prescribed medications and treatments, and assessed that Schmidt retained the mental residual functional capacity to perform simple, unskilled work that required only minimal contact with others.  (Tr. 19-20)  Thereafter, based upon the testimony of the vocational expert, the ALJ concluded that Schmidt was capable of performing work as a housekeeper, packer, or bench sorter, all jobs which existed in the national economy.  (Tr. 20)

<u>Discussion</u>

18

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."). *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852, (1972)(*quoting Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See also Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Rice v. Barnhart*, 384 F.3d 363, 368-69 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Supplemental security income insurance is available only to those individuals who can establish "disability" under the terms of the Social Security Act.  The claimant must show that she is unable

to engage in any substantial gainful activity

19

by reason of any medically determinable phys-
ical or mental impairment which can be ex-
pected to result in death or which has lasted

or can be expected to last for a continuous
period of not less than 12 months."

42 U.S.C. §423(d)(1)(A)

The Social Security regulations enumerate the five-step sequen-
tial evaluation to be followed when determining whether a claim-
ant has met the burden of establishing disability.  20 C.F.R.
§416.920.  The ALJ first considers whether the claimant is pre-
sently employed or "engaged in substantial gainful activity." 20
C.F.R. §416.920(b).  If she is, the claimant is not disabled and
the evaluation process is over; if she is not, the ALJ next
addresses whether the claimant has a severe impairment or combi-
nation of impairments which "significantly limits . . . physical
or mental ability to do basic work activities."  20 C.F.R.
§416.920(c).  Third, the ALJ determines whether that severe
impairment meets any of the impairments listed in the regula-
tions.  20 C.F.R. §401, pt. 404, subpt. P, app. 1.  If it does,
then the impairment is acknowledged by the Commissioner to be
conclusively disabling.  However, if the impairment does not so
limit the claimant's remaining capabilities, the ALJ reviews the
claimant's "residual functional capacity" and the physical and
mental demands of her past work.  If, at this fourth step, the
claimant can perform her past relevant work, she will be found
not disabled. 20 C.F.R. §416.920(e).  However, if the claimant
shows that her impairment is so severe that she is unable to

20

engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy.  42 U.S.C. §423(d)(2); 20 C.F.R. §416.920(f).

Schmidt objects to the ALJ's conclusion that her substance abuse was a contributing factor material to a finding of disability.  If such abuse was the cause of her disability, she is barred by statute from obtaining benefits. 42 U.S.C. §423(d)(2)(C). When an applicant for disability benefits both has a potentially disabling illness and is a substance abuser, the issue for the ALJ is whether, were the applicant not a substance abuser, she still would be disabled. 20 C.F.R. §404.1535(b)(1).  If so, she is considered disabled independent of the substance abuse and entitled to benefits.  20 C.F.R. §404.1535(b)(2)(ii); *Kangail v. Barnhart*, 454 F.3d 627, 628-29 (7th Cir. 2006).

During Schmidt's hearing, the ME noted that his initial opinion of marked impairment was based on his observations of her behavior throughout her testimony at the hearing.  The ALJ clarified this opinion, inquiring about the finding of marked impairment and its conflict with the most recent medical records.  At this time, the medical expert explained that his initial statement was referring to Schmidt's behavior at the hearing, and he subsequently explained that his final opinion was based upon the objective medical evidence in the file as a whole.  His evalua-

21

tion of this body of evidence produced an opinion that Schmidt suffered from only mild to moderate impairment in activities and mild impairment of social functions.

In *Kangail*, a claimant suffering from bipolar disorder for over a decade was denied benefits due to drug and alcohol abuse. *Kangail*, 454 F.3d at 628.  The Seventh Circuit reversed the denial, noting that the ALJ incorrectly inferred that improved periods in the claimant's medical record simply were due to abstinence from drugs and alcohol.  *Kangail*, 454 F.3d at 629. The ALJ improperly rejected medical testimony without adequate reasons for doing so.  *Kangail*, 454 F.3d at 629.  He misunder- stood the affect caused by bipolar disorder, mistaking the episodic nature of the illness for signs of instability caused by substance abuse.  *Kangail*, 454 F.3d at 629.  The ALJ also failed to understand the correlation of bipolar disorder with substance abuse due to patients' attempts to alleviate their symptoms, especially during the manic phases of the disorder.  *Kangail*, 454 F.3d at 629.

Unlike *Kangail*, where the claimant presented a long-term, certain diagnosis of bipolar disorder, Schmidt's diagnoses were uncertain at best.  Though Schmidt complained of bipolar disorder or manic depressive disorder, the record lacks a diagnosis to this effect.  Indeed, a 2001 psychiatric evaluation of Schmidt identified this deficit in her medical history.  In addition, a 2003 psychiatric evaluation confirmed the absence of a diagnosis of schizoaffective disorder.  Neither the record nor the medical

expert testimony provided evidence to the ALJ including a medical diagnosis of bipolar disorder.  The ALJ's decision notes Schmidt's longstanding history of substance abuse, the self-reported diagnosis of bipolar disorder, and the medical expert's opinion in determining that without the substance abuse, Schmidt presented only mild to moderate limitaions.  Therefore, the ALJ did not misunderstand the illness in concluding that Schmidt's substance abuse precluded her from being disabled.

Also unlike in *Kangail*, where the ALJ determined that the medical witnesses had contradicted themselves due to seemingly conflicting reports in the claimant's record, here the ALJ thoroughly evaluated the record as a whole and carefully ques-tioned the medical expert in reaching her conclusion.  Though the medical expert's statements at the hearing asserted two seemingly opposing views, those formed from observing Schmidt's behavior at the hearing versus those formed from consideration of her medical record, the ALJ did not misunderstand the variations of Schmidt's behavior as a sign of substance abuse.  Schmidt's record con-tained several instances of substance abuse, but it also con-tained time periods when Schmidt abstained from substance abuse. During these "clean" time periods, she consistently was assessed as only mildly impaired.  No inconsistencies in the evidence were present to confound the ALJ:  she correctly assessed the evidence before her and clearly recorded her assessment in her decision.

This instance also is not comparable to *Jarmon v. Barnhart*, No. 02 C 370, 2004 WL 742080 (N.D. Ill. April 1, 2004).  In

*Jarmon*, the ALJ mistakenly concluded that substance abuse was a material contributing factor to the claimant's impairments and found him not disabled.  *Jarmon*, 2004 WL 742080 at *8.  However, the ALJ failed to consider the combined effect of the claimant's other psychological problems in dismissing them because of the overlying substance abuse.  *Jarmon*, 2004 WL 742080 at *8.  The ALJ should not have "thrown the claimant out on his head" when a component of mental illness exists separate from the addiction disorders.  *Jarmon*, 2004 WL 742080 at *8.

Unlike *Jarmon*, where the ALJ ignored underlying mental illness upon finding substance abuse, here, the ALJ carefully considered Schmidt's capabilities and mental health isolated from her substance abuse.  As the medical expert testified, Schmidt would have marked limitations only in the presence of substance abuse and mild to moderate limitations in the absence of substance abuse.  The ALJ's decision noted that Schmidt's behavior at the hearing and her reluctance to testify about her substance abuse in the face of her record of longstanding addiction problems contrasted with psychiatric evaluations finding normal cognitive functioning and logical thought processes.  Even Schmidt's advocate at the hearing noted that the record was replete with hospital visits displaying a relationship between her substance abuse and her mental disorders.  However, the record also was replete with evaluations conducted when Schmidt was drug and alcohol free in which she displayed relatively normal cognitive

functioning.  Thus, the ALJ did not fail to consider Schmidt's
capabilities and mental health isolated from her substance abuse.

Schmidt next alleges that the ALJ mischaracterized the
medical expert's testimony.  In *Golembiewski v. Barnhart*, 322
F.3d 912, 916 (7th Cir. 2003), the Seventh Circuit held that the
ALJ had compromised a disability decision by mischaracterizing
the medical evidence.  There, the ALJ discounted the significance
of MRIs in the claimant's record but cited no evidence for this
choice.  *Golembiewski*, 322 F.3d at 917.  The ALJ also disre-
garded a treating physician's diagnosis without explaining the
inconsistency between the diagnosis and the ALJ's findings.
*Golembiewski*, 322 F.3d at 917.  Also, the ALJ in *Golembiewski*
ignored significant evidence supporting the claimant's position,
which contradicts the requirement that the ALJ evaluate the
record fairly.  *Golembiewski*, 322 F.3d at 917.

Here, unlike in *Golembiewski*, the ALJ did not mischaracter-
ize the medical evidence.  Her decision denying benefits logi-
cally and thoroughly considered the testimony of the medical
expert and the medical records.  The opening brief in support of
Schmidt's complaint, however, has inaccurately condensed and
edited the testimony of the medical expert, constructing a con-
flict in that version of the hearing that is not apparent in the
record.  Though there was some minor confusion as to whether the
medical expert initially was giving his opinion of Schmidt based
on the record or based on his observations at the hearing, the
ALJ cleared up the confusion through her series of questions.

Schmidt's brief fails to note the clarifications made by the
medical expert at the hearing and fails to acknowledge the ALJ's
accurate reliance on both the medical expert's testimony and the
medical record.  The court notes that "although the ALJ need not
discuss every piece of evidence in the record, the ALJ may not
ignore an entire line of evidence that is contrary to the rul-
ing." *Golembiewski*, 322 F.3d at 917 (internal cites omitted).
Otherwise it is impossible for a reviewing court to tell whether
the ALJ's decision rests upon substantial evidence. *Golembiewski*,
322 F.3d at 917*.  Scrutinizing the record, the transcripts, and
the ALJ's decision, it is plain that the ALJ successfully exam-
ined the evidence in its entirety, while Schmidt's opening brief
has not.

Schmidt contends that the ALJ's finding of active use of
drugs or alcohol was premised on flawed logic and the result of
the ALJ failing to build an accurate and logical bridge from the
evidence to the conclusion.  The ALJ's decision "must contain
specific reasons for the findings on credibility, supported by
the evidence in the case record, and must be sufficiently spe-
cific to make clear to the individual and to any subsequent
reviewers the weight the adjudicator gave to the individual's
statements and the reasons for that weight."  SSR 96-7p, at *2.
*See Zurawski v. Halter* , 245 F.3d 881, 887 (7th Cir. 2001); *Diaz
v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the
ALJ must articulate, at some minimum level, his analysis of the
evidence).  She must "build an accurate and logical bridge from

the evidence to [her] conclusion." *Zurawski*, 245 F.3d at 877

(*quoting* *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).

When the evidence conflicts regarding the extent of the claim-

ant's limitations, the ALJ may not simply rely on a physician's

statement that a claimant may return to work without examining

the evidence the ALJ is rejecting.  *See* *Zurawski*, 245 F.3d at 888

(*quoting* *Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir. 1986))

("Both the evidence favoring the claimant as well as the evidence

favoring the claim's rejection must be examined, since review of

the substantiality of evidence takes into account whatever in the

record fairly detracts from its weight.") (emphasis in original).

The ALJ's decision clearly stated the evidence she consid-

ered, which included Schmidt's testimony and behavior at the

hearing, the medical expert's testimony, and the medical record

evidence.  The ALJ analyzed the inconsistent and contradictory

body of evidence, attempting to discover the true nature of

Schmidt's problems.  Her decision, manifestly based upon the

irregular conduct of Schmidt at the hearing, the history of

mental impairment during periods of substance abuse and absence

of such impairments during periods of sobriety, and the medical

expert's testimony, was supported by substantial evidence.

Also contesting the ALJ's finding of substance abuse pre-

cluding disability, Schmidt contends that the ALJ used her own

judgment in absence of supporting evidence.  Schmidt argues that

*Rohan v. Chater*, 98 F.3d 966 (7th Cir. 1996), warns ALJs against

the impulse to substitute their lay opinion of mental illnesses

for that of a medical expert.  *Rohan* cautions the ALJ against the temptation to "play doctor" by making her own independent medical findings.  *Rohan*, 98 F.3d at 970.   There, the ALJ improperly disregarded the most recent objective evidence of the claimant's limitations and substituted his own judgment for that of the physician.  *Rohan*, 98 F.3d at 966*.*  His conclusion was reached without expressly relying on any medical evidence or authority, and his characterization of depression as merely the blues was erroneous.  *Rohan*, 98 F.3d at 966*.*

Unlike *Rohan*, ALJ Martin expressly considered the medical expert's testimony and Schmidt's medical record.  Her decision noted Schmidt's self-reports of psychiatric problems which contrasted with the psychiatric evaluations conducted by physicians.  The ALJ compared Schmidt's most recent mental evaluation during which she displayed normal overall cognitive functioning with Schmidt's unsure and incoherent actions and appearance at the hearing.  In accordance with the regulations and expressly considering the objective evidence, the ALJ reached her decision that, absent substance abuse, Schmidt was not disabled.

Similarly, Schmidt contends that the ALJ disregarded or mischaracterized the medical expert's testimony, and instead substituted her own judgment.  Yet, the medical expert's testimony was clear: considering the objective medical evidence including the most recent report from Schmidt's treating physician, Schmidt suffered from only mild to moderate impairment requiring minimal

restrictions in the absence of substance abuse.  The ALJ properly considered this evidence in her decision.

Next, Schmidt has alleged four flaws in the ALJ's credibility determination. This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles her opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006).  However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference.  *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002).  Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford*, 227 F.3d at 872.

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  20 C.F.R. §404.1529(a); *Arnold v. Barnhart*, 473

F.3d 816, 823 (7th Cir. 2007)("subjective complaints need not be
accepted insofar as they clash with other, objective medical
evidence in the record."); *Scheck v. Barnhart*, 357 F.3d 697, 703
(7th Cir. 2004).  If the claimant's impairments reasonably could
produce the symptoms of which the claimant is complaining, the
ALJ must evaluate the intensity and persistence of the claimant's
symptoms through consideration of the claimant's "medical his-
tory, the medical signs and laboratory findings, and statements
from [the claimant, the claimant's] treating or examining physi-
cian or psychologist, or other persons about how [the claimant's]
symptoms affect [the claimant]."  20 C.F.R. §404.1529(c);
*Schmidt*, 395 F.3d at 746-47 ("These regulations and cases, taken
together, require an ALJ to articulate specific reasons for
discounting a claimant's testimony as being less than credible,
and preclude an ALJ from merely ignoring the testimony or relying
solely on a conflict between the objective medical evidence and
the claimant's testimony as a basis for a negative credibility
finding.").

     First, Schmidt maintains that the ALJ commented on the
inconsistencies in her report noted by an examining physician,
Dr. McKian.  Asserting that the ALJ found Dr. McKian not credible
and that Dr. McKian's report was consistent with Schmidt's
symptoms and limitations as a whole, Schmidt challenges the ALJ's
related credibility finding of both the physician and Schmidt.
However, the record indicates that while Dr. McKian reported a
GAF of 40 after evaluating Schmidt, he did not state any other

diagnostic conclusions.  In addition, this evaluation, which pre-
dated Schmidt's SSI application by two years, conflicted with a
psychiatric evaluation in April 2003, assessing Schmidt's GAF at
60-70; a psychiatric evaluation in October 2003, assessing
Schmidt's GAF at 60; and yet another psychiatric evaluation in
June 2005, assessing Schmidt's GAF at 55-60.  Again, the brief in
support of Schmidt's claim of disability neglects to mention the
several subsequent evaluations and their mental assessments.  The
ALJ, however, properly considered them and delineated their con-
sideration in her decision.

Second, Schmidt asserts that the ALJ improperly failed to
consider precipitating and aggravating factors in accord with 20
C.F.R. §416.929(c)(3)(iii).  The assertion, referring to
Schmidt's June 2003 admission to the hospital after having been
discovered in a suicidal and intoxicated state with both alcohol
and cocaine in her system, is that the ALJ neglected to give
proper weight to the death of Schmidt's mother as opposed to
simply the substance abuse.  In doing so, Schmidt argues that the
ALJ made an unacceptable evaluation of her status at that time.
However, the record reflects that Schmidt's mother had died
several years prior to the hospitalization.  While it is true
that depression and anxiety could be aggravated by the death of a
parent, it is also entirely reasonable for the ALJ, considering
the record as a whole rather than simply the one line on the
admitting chart, to find that Schmidt's behavior "at that time"
substantiated substance abuse.

Third, Schmidt maintains that the ALJ improperly afforded weight to the DDS medical consultants' conclusion that Schmidt was only mildly impaired while failing to credit a treating source's opinion.  Though the contention is unclear, the court assumes that the weight given to the May 2003 psychiatric status report assessing Schmidt's GAF at 42 is the treating sources' opinion at issue.  As noted previously, subsequent evaluations conducted by physicians, rather than this report completed by a staff member who was neither a physician nor a certified psychol-ogist, were relied on by the ALJ.  It is reasonable that the ALJ, as explained in her decision, would rely on the most recent evaluations conducted at a time when Schmidt asserted that she was sober, which assessed her GAF at markedly higher levels.  The ALJ's decision relied on these more recent evaluations conducted by treating physicians and is supported by substantial evidence.

Fourth, Schmidt insists that the ALJ inferred that she had no functional mental limitations when she complied with her treatment.  However, the ALJ did not rely on an inference.  The ALJ explicitly cited the more recent mental evaluations and GAF assessments as sources. In addition, the ALJ did not conclude that Schmidt was without any functional limitations. Rather, the ALJ constructed an RFC based upon a finding of mild to moderate limitations.  Again, substantial evidence supports the ALJ's conclusion.

Schmidt's final objection is that the ALJ's hypothetical question to the VE was incomplete and thus the VE's testimony was

not supported by substantial evidence.  Because this court finds that the ALJ was acting within her discretion when making the substance abuse materiality determination, the hypothetical question posed to the VE was complete and the VE's testimony is supported by substantial evidence.

———————————

For the foregoing reasons, pursuant to Sentence Four of 42 U.S.C. §405(g), the decision of the Commissioner is **AFFIRMED.** The Clerk is **DIRECTED TO CLOSE** the case.

ENTERED this 15th day of April, 2008

s/ ANDREW P. RODOVICH
United States Magistrate Judge